**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| LOUIS VUITTON MALLETIER, S.A., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 14-cv-3419 (JMF) |
| vs. | ) | |
| | ) | |
| MY OTHER BAG, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF JOHN MALTBIE IN OPPOSITION TO DEFENDANT'S
RENEWED MOTION FOR ATTORNEY'S FEES**

I, John Maltbie, declare as follows:

1.      I am a member of the Bar of this Court and am employed as Director of Intellectual Property, Civil Enforcement for Louis Vuitton North America, Inc., the United States affiliate of Louis Vuitton Malletier, S.A., the plaintiff in this action (Louis Vuitton North America, Inc. and Louis Vuitton Malletier, S.A. shall be hereinafter referred to collectively as "Louis Vuitton").  I submit this declaration in opposition to the motion for attorney's fees filed by the defendant, My Other Bag, Inc. ("MOB").  I have personal knowledge of the facts set forth below and if called upon to testify in this matter, I would testify as follows.

2.      I have served as Director of Intellectual Property, Civil Enforcement for Louis Vuitton North America, Inc. since October 2012.  Before joining Louis Vuitton, I was in private practice — most recently with the law firm of Arnold & Porter LLP — and have litigated numerous intellectual property cases.  Notably, I have practiced in the area of brand enforcement for fashion and retail companies for the last sixteen years.

1

3.     Prior to that time, and for a period of four years, I served as Legal Fellow and later Staff Attorney for the Media Law Resource Center where I researched, wrote, and advised on developments in First Amendment law, including defamation, privacy and intellectual property issues.   Consequently, I believe I have a strong foundation in, and deep respect for, First Amendment principles.

4.     In my capacity as Director of Intellectual Property, Civil Enforcement, I oversee Louis Vuitton's intellectual property civil litigation and enforcement activities in North America. I am also familiar with Louis Vuitton's history of enforcement efforts both here and abroad.

5.     Louis Vuitton has a broad and valuable trademark and copyright portfolio.  Louis Vuitton has a robust brand enforcement program and expends significant resources to protect against the loss or diminishment of its valuable intellectual property rights.  Each matter we handle, however, is the subject of careful consideration and we only take action where we believe we have a reasonable good faith to do so.  Accordingly, in the majority of instances where we assert that Louis Vuitton's rights have been misappropriated, we are able to reach amicable resolutions without resorting to litigation.

6.     For those small number of matters where we cannot reach out-of-court resolution, we will litigate if necessary.  Contrary to MOB's assertion that "[Louis Vuitton] has wielded its limitless litigation budget undiscerningly, against counterfeiters and commenters alike," however, the decision to litigate a matter only comes after careful consideration of the merits of our position.

7.     Indeed, Courts frequently conclude that Louis Vuitton has enforced its intellectual property rights appropriately. For example, Louis Vuitton either prevailed or substantially achieved its goals in the matters referenced in the following publicly available orders:  *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339 (11th Cir. 2013); *Louis Vuitton Malletier S.A. v.*

*LY USA, Inc.*, 676 F.3d 83 (2d Cir. 2012); *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936 (9th Cir. 2011); *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, No. 13-cv-5242, ECF No. 168 (S.D.N.Y. Oct. 19, 2015); *Louis Vuitton Malletier, S.A. v. Abags.co.UK*, No. 14-cv-60288, 2015 WL 11197741 (S.D. Fla. Feb. 27, 2015); *Louis Vuitton Malletier, S.A. v. Hyundai Motor Am.*, No. 10-cv-1611, 2012 WL 1022247 (S.D.N.Y. Mar. 22, 2012); *Malletier v. Artex Creative Int'l Corp.*, 687 F. Supp. 2d 347 (S.D.N.Y. 2010); *Louis Vuitton S.A. v. Downtown Luggage Ctr.*, 706 F. Supp. 839 (S.D. Fla. 1988); *Louis Vuitton, S.A. v. After Dark Boutique*, 680 F. Supp. 1507 (N.D. Fla. 1988); *Louis Vuitton, S.A. v. EEJ Disc.*, No. 87-cv-7226, 1988 WL 74443 (N.D. Ill. July 12, 1988); *Louis Vuitton S.A., Gucci Shops, Inc. v. Bag Ctr.*, No. 85-cv-5675, 1986 WL 2611 (N.D. Ill. Feb. 21, 1986).

8.     Put simply, Louis Vuitton does not litigate or enforce its trademarks or copyrights as a business model.  Its only purpose in bringing these claims is to protect the value of the intellectual property that Louis Vuitton has developed in the line of luxury bags, apparel, accessories, and other related products that Louis Vuitton sells to consumers.

9.     Given the iconic stature of the brand, Louis Vuitton is a frequent target of third parties seeking to use Louis Vuitton's intellectual property for their own benefit.  This often results in Louis Vuitton and its famous trademarks being misappropriated in such a way as to highlight the tensions between the First Amendment and intellectual property law, in particular the intersection of trademark law and parody.  Accordingly, shortly after joining Louis Vuitton I conferred with various attorneys with expertise in First Amendment and intellectual property law, to formulate a framework for evaluating matters involving potential issues of parody.  I developed a matrix to analyze purported parody claims by looking at four primary issues:   (i) the

communicative purpose of the product; (ii) the potential for confusion and/or association; (iii) the competitive nature of the products; and (iv) the commercial purpose of the product.

10.     MOB's products first came to my attention when I saw them on a fashion law blog in July 2013.  The products caught my attention due to the unauthorized reproduction of Louis Vuitton products and intellectual property on canvas tote bags — a product category that Louis Vuitton also offers.

11.     Shortly thereafter, on or about late July 31 2013, I received an email from a Louis Vuitton colleague in Paris regarding a seizure by French customs officials of a shipment of handbags bearing depictions of Louis Vuitton handbags and trademarks.  MOB was identified as the source of these products.

12.     Before deciding to take any action, I investigated MOB's products and considered whether MOB's products were parody products, and I concluded that they were not.

13.     First, I reviewed MOB's products in light of the 4-factor matrix I had previously developed.  On balance, I believed that MOB's unauthorized use of the Louis Vuitton trademarks and copyrights was actionable.  While I understood that MOB's product line included depictions of a number of well-known handbags produced by other brands, for no other brand were registered trademarks and copyrights so liberally used.

14.     Additionally, I took into consideration the prior decision by the United States Court of Appeals for the Fourth Circuit in *Louis Vuitton Malletier, S.A. v. Haute Diggity Dog, LLC,* 507 F.3d 252 (4th Cir. 2007).  Specifically, I compared the use of Louis Vuitton's trademarks and copyrights by Haute Diggity Dog, LLC (as shown below) to the use by MOB.

4

 

15.     Second, I was aware that in 2011, Hermes International ("Hermes") had filed suit against Thursday Friday Inc. ("TFI") over the use of photographs of Hermes's Birkin handbag on a canvas tote bag in order to create the appearance that the consumer was carrying an actual Birkin handbag.  After TFI unsuccessfully moved to dismiss the complaint, the case was resolved by the entry of a Permanent Injunction on Consent.  *Hermes Int'l v. Thursday Friday Inc.*, Docket No. 11-cv-00580-AKH, ECF No. 19 (June 22, 2011).

16.     Moreover, Louis Vuitton's victory in the *Louis Vuitton Malletier, S.A. v. Hyundai Motor Am.*, No. 10-cv-1611, 2012 WL 1022247 (S.D.N.Y. Mar. 22, 2012) over a parody/fair use defense provided further support for my decision.  Accordingly, on August 9, 2013, I sent a letter to MOB on behalf of Louis Vuitton.

17.     Upon receipt of MOB's response letter in late August 2013, which raised the issue of parody, I paused in order to carefully review the assertions of MOB's response and to again evaluate existing caselaw concerning parody and intellectual property rights.

18.     On or about February 7, 2014, I sent a follow-up letter to MOB on behalf of Louis Vuitton to MOB to respond to MOB's arguments.  As part of my response, I explained that the MOB website focused on the side of the MOB tote bag that featured the Louis Vuitton handbag

designs and marks.  Further, based on my own experience, I noted that a consumer can purchase a MOB product through MOB's website without ever seeing the other side of the bag.  In fact, as stated in this letter, I found it "curious that the visitor has to hunt for what [MOB] refer[ed] as the 'front panel of the bag'" — the side that has the reference to the alleged joke.

19.     The purpose of these letters was to determine if Louis Vuitton could resolve this dispute with MOB without resorting to litigation.  After it became clear that this dispute could not be resolved amicably, on May 12, 2014, Louis Vuitton filed this lawsuit against MOB.  Louis Vuitton brought suit based on its reasonable belief that MOB was infringing or diluting its valuable trademarks and copyrights.

20.     While MOB argued in its brief to the Second Circuit that I admitted during deposition that I was "aware of no facts that would indicate" a likelihood of dilution, this is simply not true.  During my deposition, I was asked whether I was "aware of any facts that demonstrate that Louis Vuitton's brand is *any less iconic* as a result of My Other Bag's products."  [emphasis added]  While my answer was "no," that was in no way an admission that Louis Vuitton had no facts to support a finding of likelihood of dilution.  Indeed, there is no reference to the term "iconic" in the dilution provisions of the Lanham Act.

21.     MOB also tries to paint Louis Vuitton as a "trademark bully" by pointing to a number of instances in which Louis Vuitton purportedly overreached in asserting its intellectual property rights.  In each of these instances, however, there is no dispute that the third party adopted Louis Vuitton's intellectual property without authorization for its own benefit.  The dispute was whether the unauthorized use was nonetheless permissible under the law — of the United States or the laws of the various other countries in which these instances took place.  Moreover, certain of these matters were simply disputes over the use of Louis Vuitton's intellectual property on

6

commercial products, *e.g.*, Haute Diggity Dog (dog toys), Dooney & Burke (handbags), and Nadia Plesner (t-shirts and posters); some never advanced to litigation, *e.g.*, Kobe Fashion Museum and University of Pennsylvania Law School; and some involved third parties with their own significant resources, *e.g.*, Dooney & Burke, Warner Brothers, and University of Pennsylvania Law School.

22.   Finally, in this case, Louis Vuitton did not intend to, and did not in fact, leverage its greater financial resources as a litigation tactic in this case.  In my experience as an intellectual property attorney, the typical trademark and copyright litigation involves numerous depositions and extensive discovery.  In contrast, the discovery and level of activity involved in the above-captioned action was relatively modest.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       June 12, 2017

_____
John Maltbie